UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| T-MOBILE NORTHEAST LLC, Plaintiff, v. VILLAGE OF CHESTNUT RIDGE, VILLAGE OF CHESTNUT RIDGE BOARD OF TRUSTEES, VILLAGE OF CHESTNUT RIDGE PLANNING BOARD, VILLAGE OF CHESTNUT RIDGE ZONING BOARD OF APPEALS, and ALFRED A. FUSCO, JR., in his official capacity as Building Inspector, Defendants. | **OPINION AND ORDER** 23 CV 5852 (VB) |

Briccetti, J.:

Plaintiff T-Mobile Northeast LLC ("T-Mobile") brings this action against defendants Village of Chestnut Ridge (the "Village"), the Village of Chestnut Ridge Board of Trustees (the "Village Board"), the Village of Chestnut Ridge Planning Board (the "Planning Board"), the Village of Chestnut Ridge Zoning Board of Appeals (the "ZBA"), and Alfred A. Fusco, Jr., in his official capacity as Building Inspector, asserting claims under Sections 253 and 332 of the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. §§ 253(a) and 332(c)(7)(B), and Article 78 of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. § 7803. T-Mobile's claims arise from defendants' denial of its applications for a special permit, use and area variances, and site plan approval to construct a wireless telecommunications monopole in the Village.

Now pending are defendants' motion for summary judgment (Doc. #68) and plaintiff's cross-motion for summary judgment (Doc. #75).

For the reasons set forth below, defendants' motion is GRANTED IN PART and DENIED IN PART, and plaintiff's cross-motion is GRANTED IN PART and DENIED IN

PART.

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1367.

## BACKGROUND

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and declarations with exhibits.[1] These submissions reflect the following factual background.

I. The Parties and the Property

T-Mobile holds licenses from the Federal Communications Commission ("FCC") to provide personal wireless and telecommunications services in New York, including in the Village.

The Village is a municipal corporation of the State of New York. The Village Board is composed of the Village Trustees and the Village Mayor. It is authorized under the Village Code (the "Code") and the New York State Village Law to issue special use permits. The Planning Board is authorized to grant site plan approval and the ZBA is authorized to issue variances. Alfred A. Fusco, Jr., is the Village's current building inspector (the "Building Inspector").

T-Mobile's proposed facility (the "Facility") would be a 105-foot wireless telecommunications monopole, which is 110 feet to the top of the branches and 113 feet to the top of the lightning rod. Its proposed location is 221 Saddle River Road in Chestnut Ridge, New York (the "Property"). The Property is owned by the Fred Eller American Legion Post 1447 (the "Property Owner"), not by T-Mobile. T-Mobile contends that it and the Property Owner are

[1] As Judge Seibel previously ordered, the Court will disregard defendants' replies to plaintiff's responses to defendants' Local Rule 56.1 Statement. (Doc. #67).

parties to a "Site Lease with Option dated December 17, 2003," as amended, most recently, on February 19, 2021, under which the Property Owner leases a portion of the Property to T-Mobile for the Facility. (Doc. #78-1 ("Green Aff.") ¶ 3). According to plaintiff, the lease remains in effect and does not expire until April 1, 2051, absent further extension by the parties. Defendants contend that because plaintiff has not produced any lease or agreement with the Property Owner, T-Mobile cannot establish any property right to Property. (Doc. #81 ("56.1 Stmt.") ¶ 10–11).

II. The Prior Approvals (2009–2011)

Between 2009 and 2011, T-Mobile sought and obtained a substantially similar set of approvals for a monopole facility on the same site (the "Prior Approvals"). The ZBA adopted a written resolution granting use and area variances for the facility; the Planning Board granted preliminary site plan approval; the Village Board then granted T-Mobile a special permit; and the Planning Board granted final site plan approval.

T-Mobile did not construct the facility at that time. On December 29, 2020, T-Mobile notified the Building Inspector of its intent to proceed under the Prior Approvals and requested a determination as to what, if any, further approvals were required. On March 16, 2021, the Building Inspector advised T-Mobile it would need to reapply for variances, site plan approval, and a special permit. T-Mobile did not appeal or otherwise challenge that determination, and the Planning Board attorney subsequently confirmed that "[a]pproval of the tower structure requires site plan approval from the [Planning Board], a special permit from the [Village Board], and a variance from the [ZBA]." (56.1 Stmt. ¶ 109).

III. The Current Application

On June 25, 2021, T-Mobile filed an application (the "Application") with the Planning Board for site plan approval to build the Facility. The Application consisted of, among other things, application forms, a memorandum in support, a site plan, and supporting technical materials. The Application was authorized by the Property Owner.

T-Mobile complied with all requests for additional materials in support of the Application, which included a Radio Frequency ("RF") Justification Report, a Visual Impact Assessment (the "VIA") and a property evaluation report (the "Lane Report"). The RF Justification Report was submitted to show the need for the facility. It included signal propagation and drive-test data and maps, and key performance indicator ("KPI") data, including capacity-utilization charts showing that the existing sites near the Property were "approaching or at capacity exhaustion." (56.1 Stmt. ¶¶ 121, 124). This meant the existing sites could no longer handle the data and voice demands of consumers, resulting in an inability to place or maintain calls at customer-expected quality. An RF consultant retained by the Village ("Village-RF-Expert Musso") reached a similar conclusion regarding the coverage gap, opining that T-Mobile's "facilities that currently service parts of the proposed site area and the Village are now (and will increasingly be) in need of capacity relief," and the proposed Facility "would significantly improve and supplement" coverage in the immediate area. (Id. ¶ 143).

The VIA's conclusions were based in part on a "balloon test," designed and personally observed by Village-RF-Expert Musso. (Doc. #28-20 ("CR") 1029).[2] The test was conducted in

[2] "CR" refers to the certified record produced by defendants in this action bates-stamped as Village of Chestnut Ridge 000001-001168 and docketed as Doc. #28. It is also attached to the Declaration of Donald J. Feerick, Jr., in support of defendants' motion for summary judgment (Doc. #69). For ease of reference, the Court will refer to Doc. #28 as CR. The numbers

the winter, when foliage coverage is at a minimum. The VIA concluded the Facility would not result in significant aesthetic or visual impacts because, among other things, the tower would not be visible beyond 1,000 feet from the proposed site due to intervening vegetation, development, and topography, and for areas closer than 1,000 feet, it would be minimally visible due to the topography of the area. Further, landmarks and places of interest would not be impacted by the visibility of the Facility.

The Lane Report was based on a comparative sales analysis and demonstrated that the Facility would not "result in the diminution of property values or reduce the marketability of properties in the immediate area." (56.1 Stmt. ¶ 139).

Following the submission of these materials, Village-RF-Expert Musso issued a technical memorandum, concluding the Facility's proposed location "appears reasonable" based on, among other things, the Property's characteristics, available setback distances, the existing tree-line buffer, and the alternate-site analysis conducted. (56.1 Stmt. ¶ 140–41).

Following a series of hearings, the Planning Board notified plaintiff that it needed input from the Village Board to complete its review of the Facility. Accordingly, T-Mobile filed its Applications with the ZBA and Village Board on August 16, 2022.

IV. The Review Process

From April 2022 to May 2023, the Village Board, Planning Board, and the ZBA held a series of public hearings, meetings, and workshops on the Application.

The parties agreed several times to extend the review period, commonly referred to as the "shot clock," to accommodate the Village's review of the Applications—including, at the Village

following references to CR represent the bates-stamp number of the cited document(s) without the leading zeros.

Board's request, an initial extension to May 1, 2023, later extensions to May 31, 2023, and ultimately to June 20, 2023. (56.1 Stmt. ¶¶ 148, 176–179).

On October 20, 2022, notwithstanding Village-RF-Expert Musso's conclusions, the Village Board voted to retain a second RF consultant, Douglas Fishman ("Village-RF-Expert Fishman"), "as a second set of eyes" to review "the necessity, particularly the site." (56.1 Stmt. ¶ 149). The record does not reflect why Musso's analysis was considered insufficient. Village officials testified the Village Board had reviewed and considered Musso's reports, believed him "competent as an RF engineer," did not believe his reports were insufficient, was not seeking information beyond what he had provided, and "trusted and believed the conclusions" in his reports. (Id. ¶ 151). Defendants now contend the Village Board hired Fishman because the Village Board "reasonably required an independent analysis of site selection" and "opted to use someone different." (Doc. #70 at ¶ 69). They also argue it was necessary to retain a second RF Engineer because T-Mobile improperly submitted a site plan application to the Planning Board first when it was required to obtain a site selection approval from the Village Board before doing so. Thus, according to defendants, a second RF Engineer was necessary to assist the Village Board with its site plan review.

Village RF-Expert Fishman requested additional information from T-Mobile to complete his review of the Application. In accordance with such request and in response to certain public and Village comments regarding the Application, T-Mobile submitted a Supplemental RF Justification Report, which included an evaluation of six alternative locations proposed by the Village Board and the public, as well as "properties further south" as required by Village RF Fishman, and determined that such alternatives were not feasible. (56.1 Stmt. ¶ 160).

In connection with this litigation, the Village also retained a real estate appraiser and

broker, William Beckmann, to critique the reliability of T-Mobile's appraisal evidence.

V. The Village Board Denial

On May 18, 2023, the Village Board voted to deny the special permit application. It adopted a written resolution memorializing the denial on June 7, 2023 (the "Village Board Denial").

In substance, the Village Board Denial rests on three grounds.

First, the Village Board found T-Mobile failed to demonstrate a need for the Facility. The Village Board Denial states T-Mobile failed to "demonstrate . . . a sufficient gap in coverage or insufficient cell service capacity," did not "provide sufficient hard data to establish the specific location(s) of gap in coverage, including dropped call data," did not show the Facility was "the best location to remedy that gap," did not show customers would be unable to complete calls absent the Facility, did not show the Facility would primarily "benefit the Village and its residents," and Village residents were not asking for additional coverage. (56.1 Smt. ¶ 184).

Second, the Village Board found the Facility would have a negative impact on the aesthetics of the area. The Village Board found (i) the "neighborhood in which [T-Mobile] proposed to install the Cell Tower is a purely residential area where such a large structure would be an eyesore;" (ii) T-Mobile's VIA was "inadequate because it has only submitted select and limited views . . . which are clearly skewed in [T-Mobile's] favor;" and (iii) residential property owners had submitted "firsthand letters with specific details of the adverse aesthetic impact, together with hard evidence establishing that the adverse visual and aesthetic impact will be substantially and significantly adverse." (CR 695 at ¶¶ 34–36).

Third, the Village Board Denial found the Facility would adversely affect surrounding property values, citing concerns raised by adjacent property owners and submissions from "local

realtors" establishing adverse impact on their property values. (CR 696 at ¶ 46). The Village Board Denial does not identify any competing appraisal or comparative sales analysis. Outside of firsthand concerns, the only other evidence in the record at the time of denial consists of citations to professional studies finding an adverse impact on property values, contained within an opposition memorandum submitted by a group of neighboring residents. (CR 459–524). The Mayor of the Village, Rosario Presti, Jr., testified he was not aware of the professional studies, including information about where they were performed. (Doc. #78-5 at Tr. 170). In response to this opposition memorandum, T-Mobile submitted a "Supplemental Lane Report," in part criticizing the professional studies as having "considered the health effects of nearby cell tower[s]" (CR 1104-06). The professional studies did not assess properties within close proximity to the Property.

Throughout the hearing process, members of the public repeatedly raised concerns about the health effects of RF emissions, including statements that "cancer is more prevalent in kids living near cell towers" (CR 893) and that a named researcher had "research[ed] the effect of cell towers and found cancer up to 20 years after RF exposure." (CR 894). The Village Board Denial states that it "explicitly excluded from its consideration or reasoning for denial any comments, statements, submissions or any other materials or information regarding any potential adverse health concerns or effects over radio frequency (RF) emissions, other than to attempt to confirm that the Applicant's Cell Tower complies with the applicable federal standards." (CR 693 at ¶ 2). Mayor Presti advised the public before the hearing that the RF-emissions issue was not one the Village Board was "able to consider" because it had "already been determined" at the federal and state level. (56.1 Stmt. ¶ 82). He further testified at his deposition that the Facility is "without question . . . safe" from an RF standpoint. (Id. ¶ 85).

## VI. The Planning Board and ZBA Denials

The Planning Board and ZBA did not separately evaluate the site plan and variance applications on the merits. On June 19, 2023, the ZBA voted to deny the variance applications as moot in light of the Village Board Denial, adopting a written resolution to that effect on July 17, 2023 (the "ZBA Denial"). On July 24, 2023, the Planning Board likewise voted to deny the site plan application as moot, adopting a written resolution on July 26, 2023.

## VII. Fees Imposed on T-Mobile

In connection with the Application, T-Mobile submitted a total $2,175 in application fees, including a $250 appearance fee for each of the hearings held on the Applications, and fees for submitting the Application to the Village Board, Planning Board and the ZBA. In addition to the initial $5,000 escrow fee paid by T-Mobile to the Planning Board, T-Mobile paid an additional $13,000 specifically for Village-RF-Expert Musso's review of the Application, even though the Village's agreement with Musso only authorized a total of $9,000. T-Mobile also paid an additional $18,374 specifically for Village-RF-Expert Fishman's additional review of the Application. In total, plaintiff submitted over $55,500 in escrow fees for the Village's chosen consultants.

Mayor Presti also testified the Village imposes no cap on consultant fees and does not review consultant invoices for reasonableness or merit before passing them through to the applicant, but attests now—in connection with the instant motion—that the Village Board and Treasurer in fact reviewed each invoice before payment.

**DISCUSSION**

I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any declarations show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[3]

A fact is material when it "might affect the outcome of the suit under governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation."

[3] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "[T]he mere existence of a scintilla of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77,82–83 (2d Cir. 2004). Bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

When, as here, the parties have filed cross-motions for summary judgment, the Court evaluates each motion on its own merits, drawing all reasonable inferences against the party whose motion is under consideration. Morales v. Quintel Ent., Inc., 249 F.3d 115, 121 (2d Cir. 2001).

## II. Standing

Both parties move for summary judgment on the issue of standing. The Court finds plaintiff has established standing.

### A. Legal Standard

To establish standing under Article III of the Constitution, "(1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision."

Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016). An injury-in-fact is "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016). "To satisfy the redressability requirement of Article III standing, the plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Allco Fin. Ltd. v. Klee, 861 F.3d 82, 96 (2d Cir. 2017).

In addition to establishing Article III standing, a plaintiff must demonstrate standing to sue under the statute at issue. Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 128 (2014). "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation" will have standing. TransUnion LLC v. Ramirez, 594 U.S. 413, 427 (2021).

On summary judgment, a plaintiff must set forth by affidavit or other evidence specific facts showing that there is no genuine dispute as to facts that attest to his standing." Lugo v. City of Troy, 114 F.4th 80, 88 (2d Cir. 2024).

B. Analysis

Defendants argue plaintiff does not have standing because it does not have a property interest in the property on which the Facility would sit.[4]

The Court disagrees.

Contrary to defendants' contention, irrespective of the fact that plaintiff has not produced the lease or any other written agreement with the Property Owner, plaintiff has shown it has had a valid property interest in the Property at all relevant times. An employee in T-Mobile's legal department, Shelly Green, executed an affidavit, attesting to the existence of a lease agreement

[4] Defendants do not challenge any of the other elements of standing. (See Doc. #74 at 5–9).

between plaintiff and the Property Owner. (Green Aff. at ¶¶ 3–4). And the chief executive officer of the Property Owner, Charles Bronson, also attested to the existence of a lease agreement based on personal knowledge. (Doc. #79). "On a motion for summary judgment, litigants may, and commonly do, rely on affidavits made on personal knowledge." U.S. Specialty Ins. Co. v. Wesco Ins. Co., 529 F. Supp. 3d 251, 256–57 (S.D.N.Y. 2021). The Court has no reason to doubt that these affidavits are not based on personal knowledge, and defendants have submitted no evidence to suggest otherwise. Therefore, the Court may rely on these sworn statements to establish plaintiff's property interest in the property.[5]

Further, the Property Owner authorized T-Mobile's Application. (Doc. #69-6 at 4). And at no point—indeed, defendants concede as such (Doc. #84)—did defendants base their decision to deny the Application on plaintiff's lack of standing before the Village Board. In sum, the record reflects that defendants understood plaintiff's Application to have been made with the authority of the Property Owner, such that plaintiff can establish a property interest in the site. Accordingly, plaintiff has standing to sue. See Eco-Site, LLC v. City of Univ. City, Mo., 431 F. Supp. 3d 1069, 1075 (E.D. Mo. 2019) (finding developer had standing to bring TCA claim when the Board understood the application to have been made with the authority of the proper owner).

---

[5] Defendants argue the Green affidavit is insufficient to establish standing because it is self-serving. But so long as the affidavit complies with Federal Rule of Civil Procedure 56(c) in that it is not conclusory and based on the affiant's personal knowledge, the Court may rely on it to establish the existence of the lease. And because "[t]he testimony of a party to a proceeding is usually self-serving . . . a court may not disregard such testimony simply on this basis." Fernandez v. HR Parking Inc., 407 F. Supp. 3d 445, 449 n.4 (S.D.N.Y. 2019).

Defendants also challenge Bronson's declaration (Doc. #79) on the ground that he is not a signatory to the purported lease. But this argument is not persuasive. The Court has no reason to doubt that Bronson has personal knowledge of the existence of the lease, and defendants do not proffer anything to suggest the contrary.

III. Violations of Section 332 and Article 78 (Counts I and VII) (Substantial Evidence Claims)

The parties each argue they are entitled to summary judgment on Counts I and VII of the amended complaint, alleging, respectively, violations of TCA Section 332(c)(7)(B)(iii) and Article 78 of the New York Civil Practice Law and Rules ("Article 78"). Plaintiff argues the Court should grant summary judgment because defendants' denial of the Application was not supported by substantial evidence; defendants argue the contrary.

The Court agrees with plaintiff.

A. Legal Standard

The TCA requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). In determining whether a denial was supported by substantial evidence, courts use the "traditional standard used for judicial review of agency actions." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999). Although the Court does not engage in its own fact-finding, it does examine the entire record to determine whether a decision is supported by substantial evidence. Id. "[S]ubstantial evidence requires evaluation of the entire record, including opposing evidence, and requires a decision to be supported by less than a preponderance but more than a scintilla of evidence." Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 638 (2d Cir. 1999).

Although the TCA establishes procedural requirements that local boards must comply with in evaluating cell site application, "local and state zoning laws govern the weight to be given the evidence." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d at 494. Here, the applicable local law is the Village Code, which sets forth the requirements for obtaining approval

to construct a new telecommunications facility. As to the applicable state law, because in New York wireless carriers such as T-Mobile "are afforded the status of public utilities for the purposes of zoning applications," that showing is governed by the public-necessity standard set out in Consolidated Edison Co. v. Hoffman, 43 N.Y.2d 598 (1978). New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs., 812 F. Supp. 2d 143, 154 (E.D.N.Y. 2011). Under this standard, a provider need only show "[1] that there are gaps in service, [2] that the location of the proposed facility will remedy those gaps and [3] that the facility presents a minimal intrusion on the community." Id. (citing Site Acquisitions, Inc. v. Town of New Scotland, 2 A.D.3d 1135 (3d Dep't 2003)). As to the applicable local law, Code Section 290-77 requires an applicant for a special permit to submit proof satisfactory to the Village Board that there is a "public necessity for the siting of a new public utility building and/or structure." (56.1 Stmt. ¶ 187) (citing Code at § 290-77(A)(2)).

Article 78 provides that a party is entitled to relief from a local zoning decision that is "arbitrary and capricious" or is not supported by substantial evidence. N.Y. C.P.L.R. §§ 7803(3)–(4). "The Article 78 test is essentially the same as that under the TCA." T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp. 2d 446, 461 (S.D.N.Y. 2009).

Because the two standards of review are coextensive, the Court addresses them together. See T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp. 2d 461 (addressing TCA and Article 78 substantive evidence claims together).

B. Analysis

Plaintiff argues that the reasons for the Board's denial—that T-Mobile failed to demonstrate (i) a need for the Facility; (ii) that the Facility is the least intrusive means to remedy its need, and (iii) that the Facility will have no adverse impact on the value of surrounding

properties—are not supported by substantial evidence.

The Court agrees.

1. Public Need for the Facility

The Village Board Denial rejected the Application on the ground that T-Mobile failed to demonstrate a need for the Facility because: (i) it did not demonstrate a "sufficient gap in coverage or insufficient cell service capacity"; (ii) it did not "provide sufficient hard data to establish the specific location(s) of gap in coverage, including dropped call data" or "how the proposed Cell Tower would be the best location to remedy that gap"; (iii) it did not submit "probative evidence that in the absence of this proposed Cell Tower that T-Mobile's cell customers will be unable to use its wireless services or to a landline"; (iv) it did not demonstrate that the Facility will primarily "benefit the Village and its residents"; and (v) Village residents are "not asking for additional coverage." (CR 693–96).

These reasons are not supported by substantial evidence.

The Village Board Denial states T-Mobile failed "to demonstrate . . . a sufficient gap in coverage or insufficient cell service capacity." (CR 693 at ¶ 7). That assertion is not supported by the record. T-Mobile submitted capacity-utilization data showing its existing sites near the Property are "approaching or at capacity exhaustion," such that it can longer handle customer demand, resulting in decreased quality and increased call dropping. (56.1 Stmt. ¶ 124). Although the Village Board was not bound to accept T-Mobile's evidence without question, there was no contrary expert testimony—or, indeed, any evidence at all—to contradict it. Indeed, the Village Board's own retained RF consultant, Village-RF-Expert Musso, reached a similar conclusion regarding the coverage gap, opining that T-Mobile's "facilities that currently service parts of the proposed site area and the Village are now (and will increasingly be) in need

of capacity relief," and the proposed Facility "would significantly improve and supplement" coverage in the immediate area. (Id. ¶ 143). That even defendants' own consultant identified these coverage gaps further undermines any claim that the Village Board's finding was supported by substantial evidence. See ExteNet Sys., Inc. v. Vill. of Plandome, 2021 WL 4449453, at *16–17 (E.D.N.Y. Sep. 29, 2021) ("[T]he Board's determination the plaintiff failed to establish a coverage gap is not supported by substantial evidence" because defendants' own consultants "confirmed plaintiff's conclusions as to coverage needs.").

In sum, the Village Board here "effectively had no evidence before it to conclude" that there was no sufficient gap in coverage or insufficient cell service capacity. ExteNet Sys., Inc. v. Vill. of Plandome, 2021 WL 4449453, at *17.

The Village Board Denial next asserts T-Mobile did not "provide sufficient hard data to establish the specific location(s) of gap in coverage, including dropped call data," or show "how the proposed Cell Tower would be the best location to remedy that gap" and "did not submit probative evidence that in the absence of this proposed Cell Tower that T-Mobile's cell customers will be unable to use its wireless services or to a landline." (56.1 Stmt. ¶ 184).

Nothing in the Village Code or the TCA requires an applicant to present coverage-gap data in any particular form. Failure to specifically present dropped call data, without more, is not an adequate basis on which to deny the Application. See Orange Cnty. -Poughkeepsie Ltd. P'ship v. Town of E. Fishkill, 84 F. Supp. 3d 274, 305 (S.D.N.Y. 2015), aff'd 632 F. App'x 1 (2d Cir. 2015) ("[N]othing in the Code or the TCA requires that Plaintiffs present data on dropped calls or customer dissatisfaction, and, accordingly, it is not, without more, an adequate basis on which to deny the Application); New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs., 812 F. Supp. 2d at 161 ("[T]he fact that [cell phone carrier] did not present statistical

data on dropped or missed calls also was not a valid basis for denying the Application" when Code did not impose "affirmative obligation to submit statistical evidence of dropped or missed calls.").

Rather, in support of its application, T-Mobile submitted "signal propagation and drive test data and maps, and key performance indicator ("KPI") data including capacity utilization charts to demonstrate that the Facility is needed to increase coverage and capacity in order to provide reliable in-building and in-vehicle service throughout the Service Gap" and, based on this analysis, concluded that a "significant gap in coverage exists over each of the frequencies through which T-Mobile provides personal wireless services." (56.1 Stmt. ¶¶ 121–22). The Village Board Denial does not identify any deficiency in the data T-Mobile submitted. It simply concludes without explanation that the data was insufficient.

The Village Board Denial's remaining reasons—that the Facility would not primarily "benefit the Village and its residents," and that Village residents were "not asking for additional coverage"—fare no better. (56.1 Stmt. ¶ 184). For one, these conclusions are contradicted by defendants' own testimony in this action. (Doc. #78-5 at Tr. 42, 131) (Mayor Presti testified approximately a dozen citizens expressed concern that there was a gap in service in the Village during the hearing process and acknowledging "all cell carriers have a gap" in the Village). At bottom, the only support for these findings in the record consists of the Village Board's own unexplained and unsupported assertions about the absence of resident complaints about coverage. These conclusory observations do not undermine T-Mobile's unrebutted technical showing.

The Court finds that the Village Board's Denial based on lack of need disregarded T-Mobile's uncontroverted evidence that the Facility satisfied the Code's requirements and the

state law public necessity standard of showing a coverage gap which would be remedied by the proposed Facility. Instead, the Village Board primarily based its rejection of the Application on T-Mobile's failure to satisfy requirements that were not based in any applicable state or local law. Accordingly, the Board's "proffered reasons for denying the Application are not supported by substantial evidence and [are] therefore in violation of the TCA." New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs., 812 F. Supp. 2d at 155.

2. Least Intrusive Means to Remedy its Need

Plaintiff contends the Village Board's conclusion that T-Mobile failed to show the Facility is the least intrusive means of remedying the coverage and capacity needs is not supported by substantial evidence.

The Court agrees.

Here, T-Mobile demonstrated that the Facility is the least intrusive means of remedying the coverage gap. Courts have concluded that wireless providers do not need to consider "every potential alternative" to show the proposed facility is the least intrusive means to remedy a coverage gap. New York SMSA Ltd. P'ship v. Town of Oyster Bay, 2013 WL 4495183, at *18 (E.D.N.Y. Aug. 16, 2013). To the contrary, "[t]he law only requires [the provider] to engage in a good faith effort to evaluate alternative sites." Id.

In connection with the Application, T-Mobile's RF engineer analyzed the alternative sites proposed by the Planning Board, members of the public, the Village Board, and the additional sites the Village's own second RF consultant proposed "to the south" of the Property, and concluded that none was a feasible substitute. (56.1 Stmt. ¶ 154, 169). Based on propagation maps and other analyses, according to the engineer, each was too far from the coverage gap to provide adequate signal strength and capacity relief, was blocked by intervening terrain or

vegetation, was already occupied by a T-Mobile facility, or would merely shift, rather than close, the gap to an unpopulated area. (56.1 Stmt. ¶¶ 128–29, 160).

It is undisputed that no alternative site or design was ever proposed during the administrative hearing process that the Village Board's own consultants found superior to the Property. (See 56.1 Stmt. ¶¶ 195-196).[6] Indeed, Village-RF-Expert Musso agreed that the Property's location "appears reasonable" based on, among other things, "the findings of the alternate site analysis conducted." (56.1 Stmt. ¶ 141). Bare assertions that alternative sites would provide "sufficient" and "comparable coverage" (CR 694–95 at ¶¶ 26–27), do not constitute substantial evidence on which defendants may rely in denying T-Mobile's application. See Cellco P'ship v. Town of Clifton Park, New York, 365 F. Supp. 3d 248, 260–61 (N.D.N.Y. 2019).

At bottom, T-Mobile met its burden of investigating alternatives and presented credible evidence regarding the infeasibility of alternative sites, and the Village Board presented no evidence to the contrary. See New York SMSA Ltd. P'ship v. Inc. Vill. of Mineola, 2003 WL 25787525, at *9 (E.D.N.Y. Mar. 26, 2003).

3. Aesthetics

Under the TCA, aesthetics qualifies as a permissible ground for denial of a permit only if there was more than a mere scintilla of evidence before the Village Board on the negative visual impact of the Facility. Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d at 495. A "few generalized expressions of concern with aesthetics cannot serve as substantial evidence on which

---

[6] In this litigation, Mayor Presti testified that the Village Board believed four other alternative locations were better alternatives. However, it is undisputed the Village Board did not perform any analyses to determine whether those four alternative locations were better and that these sites were only raised during this litigation, and not during the administrative hearing process.

the [Village Board] could base the denials." Id. at 496.

In connection with its Application, T-Mobile submitted a VIA prepared by a third-party consulting firm. The VIA concluded the Facility would not result in significant aesthetic or visual impacts because, among other things: (i) the tower would not be visible beyond 1,000 feet from the proposed site; (ii) for areas closer than 1,000 feet, it would be minimally visible due to the topography of the area; and (iii) landmarks and places of interest would not be impacted by the visibility of the Facility.

In denying T-Mobile's Application, the Village Board concluded: (i) the "neighborhood in which Applicants proposed to install the Cell Tower is a purely residential area where such a large structure would be an eyesore to the families in the area as well as outside of the area throughout the Village, and neighboring communities"; (ii) T-Mobile's "visual and aesthetic impact analysis is inadequate because it has only submitted select and limited views of the proposed Cell Tower that it projects and which are clearly skewed in [T-Mobile's] favor as they omit the view from the residential properties located adjacent to and near the Property"; and (iii) T-Mobile has not established "through sufficient credible evidence that the adverse visual impacts on adjacent and nearby residential properties would be minimal or insignificant whereas the residential property owners have submitted firsthand letters with specific details of the adverse aesthetic impact together with hard evidence establishing the adverse visual and aesthetic impact will be substantially and significantly adverse." (CR 695).

The Village Board discredited the VIA because it allegedly included selective and limited views of the Facility and was insufficient to rebut the firsthand letters from residents who are best situated to understand the aesthetic impacts of their homes. But the certified record is devoid of any evidence, let alone substantial evidence, to rebut T-Mobile's showing of no

significant visual impact based on the expert analysis. See Sprint Spectrum L.P. v. Town of North Stonington, 12 F. Supp. 2d 247, 254 (D. Conn. 1998) (holding that the burden was on the Commission to support its basis for disregarding Sprint's expert report, and it could not rely on speculative concerns of town residents). For one, it is undisputed that the VIA's balloon test was designed and observed by an expert retained by the Village. This undermines the Village Board's assertion that the report was inadequate and skewed in T-Mobile's favor. As such, the Village Board's decision to discount the VIA in evaluating the aesthetic impact of the proposed project was not supported by substantial evidence. See New Cingular Wireless PCS, LLC v. Town of Fenton, 843 F. Supp. 2d 236, 248–52 (N.D.N.Y. 2012) (decision to discount expert analysis not supported by substantial evidence when town board provided no objective evidence that the test was inaccurate).

Further, defendants' reliance on letters submitted by residential property owners in the immediate vicinity is misplaced, as the law is clear that "[o]bjections based on aesthetic grounds should be articulated specifically and cannot be premised on a few generalized expressions of concern." Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill, 84 F. Supp. 3d at 309. Although the residents expressed concerns about the aesthetic impact on the village, such concerns fail to identify "specific aesthetic problems" the proposed facility would create. T-Mobile Ne. LLC v. Inc. Vill. of E. Hills, 779 F. Supp. 2d 256, 268 (E.D.N.Y. 2011).

Moreover, defendants' reliance on Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529 (2d Cir. 2005), is unpersuasive. In that case, the court held a town board could discount an applicant's expert crane- or balloon-test evidence when the test suffered from specific, identified defects. There, the absence of any prior notice of the test to residents and the failure to account for seasonal foliage together allowed the board to credit contrary lay and

expert evidence from neighbors. Id. at 533. Those defects are not present here: the Village's own RF consultant dictated the scope and locations of the VIA test. He was present for and personally observed the balloon test, and the record does not reflect that residents lacked notice of the test. That the VIA was conducted in winter, when "foliage coverage is at a minimum" (CR 330), if anything cuts against, not for, the Village Board's aesthetic finding, since a test performed under worst-case conditions and still showing minimal visibility beyond 1,000 feet is more, not less, probative of the Facility's limited visual impact. Unlike in Omnipoint Commc'ns, Inc. v. City of White Plains, defendants point to no comparable methodological defect in T-Mobile's expert analysis, and the residents' letters on which the Village Board relied articulate only generalized concerns rather than "specific aesthetic problems" capable of rebutting expert evidence. T-Mobile Ne. LLC v. Inc. Vill. of E. Hills, 779 F. Supp. 2d at 268.

Accordingly, the Village Board Denial based on aesthetic impact was not grounded in substantial evidence as required by the TCA.

4. Property Values

The Village Board also denied the Application because the Facility would adversely impact the property values of nearby homes. As with the aesthetic impact, there is likewise no substantial evidence supporting these findings. The Village Board Denial is based on (i) concerns raised by adjacent property owners, concerning how the Facility would impact their respective "use and enjoyment of their homes, from their backyards, patios, and while walking their kids to the school bus, or through the neighborhood" as well as (ii) submissions from "local realtors establishing substantial adverse impact on their property values." (CR 696). In rendering its decision, the Village Board ignored the Lane Report which found—based on a

comparative sales analysis—the Facility would "not result in the diminution of property values or reduce the marketability of properties in the immediate area." (56.1 Stmt. ¶¶ 47, 198–99).

The Village Board claims the appraisal reports were defective, but courts have consistently upheld the use of comparative sales analyses, such as those used in the Lane Report, to demonstrate any impact on property values. See, e.g., T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp. 2d at 463 (no substantial evidence supporting denial of permit when T-Mobile utilized comparative sales analysis prepared by appraiser concluding cell tower would not adversely affect property values).

In general, the Village Board's finding that the Facility would lower neighboring property values is conclusory. The only evidence in the record at the time of denial consists of citations to professional studies finding an adverse impact on property values, contained within an opposition memorandum submitted by a group of neighboring residents. Not only did Village representatives "not know anything about the professional studies" (56.1 Stmt. ¶ 201), but these studies do not adequately rebut plaintiff's appraisal assessment, as they did not assess properties in close proximity to the Property. (CR 1105-1106). The Village never conducted any appraisal of any properties located in Chestnut Ridge (56.1 Stmt. ¶ 199), and instead relied on "unspecific, unsupported statements that cell towers adversely affect property values." T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp. 2d at 463. These concerns, without more, are not enough to meet the substantial evidence standard.

Defendants now rely on an opinion by William Beckmann, a real estate appraiser, submitted only in connection with the instant motion, to argue that the Lane Report is unreliable. But there is no evidence the Village Board relied on Beckmann's opinions when denying the Application. Beckmann was not retained until after this litigation commenced. The Court's

review of whether the substantial evidence standard is met is based on the closed administrative record before the Village Board at the time of the Village Board Denial, not on evidence developed for the first time in litigation. See New Cingular Wireless PCS, LLC v. Vill. of Oyster Bay Cove, 2026 WL 876510, at *4 n.6 (E.D.N.Y. Mar. 31, 2026). The Court therefore cannot consider the Beckmann opinion in assessing whether the Village Board's property-value finding, when made, was supported by substantial evidence.

Indeed, the only evidence on which the Court finds the Board relied when denying the Application consisted of generalized concerns about a potential decrease in value submitted by neighboring homeowners and a local real estate broker. In light of plaintiff's contradictory expert evidence, such concerns cannot meet the substantial evidence standard the TCA requires. See Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill, 84 F. Supp. 3d at 312.[7]

Accordingly, the Court finds that none of the three grounds identified in the Village Board Denial—need, alternative means, or aesthetic/property-value impact—is supported by substantial evidence in the written record, as required by 47 U.S.C. § 332(c)(7)(B)(iii).

Having found that the Village Board Denial is not supported by substantial evidence under the TCA, the Court likewise finds that the denial is arbitrary and capricious under Article 78. See New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs., 812 F. Supp. 2d at 167. Plaintiff is therefore entitled to summary judgment on Counts I and VII, and defendants' motion

[7] Plaintiff argues the Village Board Denial is not supported by substantial evidence because defendants failed to adhere to their own past precedent. (Doc. #76 at 9–11). Although the Court notes that the Village Board's aesthetic and property-value findings are difficult to reconcile with the Village's prior approval of a special permit for a substantially similar facility, plaintiff does not point to, nor is the Court aware of, any support for the proposition that the Village's departure from its prior precedent can be, by itself, grounds to find a denial unsupported by substantial evidence under the TCA.

for summary judgment on those counts must be denied.

IV. Violation of Section 332(c)(7)(B)(i)(II) (Count III) (Effective Prohibition Claim)

Plaintiff argues defendants' denial of the Application effectively prohibited personal wireless services in violation of 47 U.S.C. Section 332(c)(7)(B)(i)(II).[8]

The Court agrees.

A. Legal Analysis

The TCA provides that state and local regulation of the placement of wireless facilities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). The Second Circuit interprets this provision—also known as the effective prohibition provision—as precluding a local government from regulating personal wireless service facilities in such a way as to prohibit remote users from reaching such facilities. Sprint Spectrum L.P. v. Willoth, 176 F.3d 630, 643 (2d Cir. 1999) ("Willoth").

Under Willoth, a municipality may not deny an application for a facility that represents the least intrusive means of closing a significant gap in a remote user's ability to connect to a cell site with access to land lines. Sprint Spectrum L.P. v. Willoth, 176 F.3d at 643. A plaintiff asserting an effective prohibition claim therefore bears the burden of establishing (i) a significant coverage gap and (ii) that the proposed facility is the least intrusive means available to close the gap. Indus. Tower & Wireless, LLC v. Roisman, 2025 WL 3002379, at *1 (2d Cir. Oct. 27, 2025). For purposes of determining whether a denial constitutes an effective prohibition of

[8] Plaintiff argues that the Village Board Denial also violates Section 253(a) (prohibition of service). However, Section 253 may be used to challenge local regulations, whereas Section 332(c)(7) may be used to challenge local decisions. Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 2013 WL 3357169, at *17 (S.D.N.Y. July 3, 2013), aff'd, 552 F. App'x 47 (2d Cir. 2014). Section 253 "deals with the laws themselves, not discretionary decisions made pursuant to those laws." Id. Accordingly, Section 253(a) does not apply to plaintiff's claims based on the denial of the Application.

service under the TCA, a court may consider "additional evidence beyond that which was introduced at the local level." New Cingular Wireless PCS, LLC v. Inc. Vill. of Muttontown, 2025 WL 2467044, at *6 (E.D.N.Y. Aug. 27, 2025).

B. Analysis

Plainitff argues that the Village Board Denial effectively prohibited its services because the identified service gap is significant and defendants failed to show a viable, available, less intrusive alternative.

The Court agrees.

1. Significant Gap in Coverage

The first prong of an effective prohibition claim requires a plaintiff to show a significant gap in wireless coverage. "There are no magic numbers or percentages that constitute a significant gap." Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill, 84 F. Supp. 3d at 297. Instead, courts look to various factors, including the size of the gap, the geographic scope it affects, how many users are impacted, and whether the carrier's customers in that area experience the deficiency uniformly. See New Cingular Wireless PCS, LLC v. Vill. of Oyster Bay Cove, 2026 WL 876510, at *8.

T-Mobile has established that there is a significant gap in coverage. During the application process, T-Mobile presented strong evidence—credited in substantial part by Village-RF-Expert Musso—that a significant wireless coverage gap existed. (See supra Section III.B.1). And, in connection with this litigation, T-Mobile further corroborated this finding, through its submission of the expert report by Richard Conroy, demonstrating T-Mobile's significant service gap in accordance with accepted industry methodologies. Using "best server maps, actual drive test data, calculated coverage maps, and [KPIs]" (56.1 Stmt. ¶ 220), Conroy

concluded that a service gap existed over an area of approximately 1.6 square miles, containing approximately 3,664 residents, and encompassing portions of heavily travelled roadways, generating a significant amount of wireless traffic. (56.1 Stmt. ¶¶ 96, 221; Doc. #78-4 ("Conroy Report") ¶¶ 94, 96, 99, and 101). Further, Conroy found the rate of dropped calls ranged between 9.4% to 100%, consistently exceeding the 1% industry standard threshold for unreliable service. (Conroy Report ¶¶ 77–78).

It is well-established that such a gap in service constitutes a significant gap. See e.g., New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs., 812 F. Supp. 2d at 149, 162 (holding gap measuring approximately 1.2. miles north to south and approximately .6 miles east to west was a significant gap); Orange Cnty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill, 84 F. Supp. 3d at 300 (finding gap in coverage affecting wireless service on a busy commute route significant for purposes of effective prohibition provision); Crown Castle Fiber LLC v. Town of Oyster Bay, 2024 WL 1051171, at *21 (E.D.N.Y. Jan. 19, 2024), report and recommendation adopted, 2024 WL 1090305 (E.D.N.Y. Mar. 13, 2024) (significant gap when maximum drop call rates ranged from 4% to 50%).

In light of the evidence of the gap's size, its location, and the number of people it affects—evidence substantiated by the Village's expert or otherwise uncontested by the defendants—the Court concludes that plaintiff has established that a significant gap exists to satisfy the first prong of its effective prohibition claim.

2. Least Intrusive Means

Having established a significant gap in coverage, T-Mobile must also show that the Facility "is the least intrusive means for closing" that gap. Sprint Spectrum L.P. v. Willoth, 176 F.3d at 643. This showing requires proof that T-Mobile made "a good faith effort to evaluate

alternative sites" to show the Facility was "more feasible than other options." New York SMSA Ltd. P'ship v. Vill. of Floral Park Bd. of Trs., 812 F. Supp. 2d 143, 165 (E.D.N.Y. 2011). The provider need not "consider every potential alternative." New York SMSA Ltd. P'ship v. Town of Oyster Bay, 2013 WL 4495183, at *18. Rather, it need only engage in a good-faith evaluation of the alternatives available to it. Id.

As discussed above in connection with the Village Board's substantial-evidence findings, T-Mobile's RF engineer analyzed each of the alternative sites proposed by the Village Board, members of the public, and the Village's own second RF consultant during the administrative process, and concluded—based on propagation maps and other RF analyses—that none was a feasible substitute. (See supra Section III.B.2).

Further, Conroy separately evaluated all fourteen alternative sites identified during the application and hearing process, together with four additional sites identified during this litigation, and concluded that each was located outside of the area with a service gap, incapable of providing coverage or capacity relief comparable to the Facility, would have required a structure similar in size and scope to the Facility, and/or was situated in a more densely residential area than the Property—making every proposed alternative no less intrusive than the Facility itself. T-Mobile's litigation planning expert, Nancy Doon, independently confirmed that the Facility is the least intrusive means available to remedy the gap in service. Defendants neither deposed Conroy nor produced a competing RF report to rebut his conclusions, and they produced no planning expert to rebut Doon's.

On this record, no genuine dispute of material fact exists that the Facility represents the least intrusive means available to remedy T-Mobile's significant gap in coverage, and T-Mobile has therefore satisfied both prongs of the Willoth test.

Accordingly, the Village Board Denial amounts to an effective prohibition of service under the TCA.

V. Violations of 47 U.S.C. Section 253(a) (Count IV) (Prohibition of Service Claim)

Plaintiff argues it is entitled to summary judgment on its prohibition of service claim because the Village's municipal fees associated with the Application and the application criteria set forth in the Village Code prohibited its ability to provide telecommunication service in violation of Section 253(a).[9] Defendants move for summary judgment on the ground that the fees and criteria do not violate Section 253(a).

The Court finds there is a genuine dispute of fact precluding summary judgment as to the fees, but denies plaintiff's summary judgment motion as to the application criteria.

A. Legal Analysis

Section 253(a) of the TCA provides that "[n]o State or local statute or regulation . . . may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). An ordinance or regulation that "materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment" violates Section 253(a). TCG N.Y., Inc. v. City of White Plains, 305 F.3d 67, 76 (2d Cir. 2002).

[9] On summary judgment, plaintiff for the first time alleges that the review process, including the fees charged, violates both Section 253(a) (prohibition of service) and 332(c)(7)(b)(i)(ii) (effective prohibition). "It is well settled that a Court should not on summary judgment consider factual allegations and legal theories not raised in the complaint." Brown v. Magistro, 2011 WL 6399514, at *3 (S.D.N.Y. Dec. 20, 2011). Since plaintiff did not allege the review process violated the effective prohibition provision in its first amended complaint, the Court will only assess whether the review process violated Section 253(a), the prohibition of service provision. Beckman v. U.S. Postal Serv., 79 F.Supp.2d 394, 407–08 (S.D.N.Y. 2000).

B. Analysis

1. Fees

Municipal fee requirements violate Section 253(a) unless they meet the following conditions: "(1) the fees are a reasonable approximation of the state or local government's costs, (2) only objectively reasonable costs are factored into those fees, and (3) the fees are no higher than the fees charged to similarly-situated competitors in similar situations." T-Mobile Ne. LLC v. Town of Hempstead, New York, 2020 WL 13560055, at *3 (E.D.N.Y. Dec. 16, 2020) (citing In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. 9088 (2018)).

The Village imposed application, appearance and escrow fees in connection with T-Mobile's Application. T-Mobile submitted a total of $2,175 in application fees, including a $250 appearance fee for each of the hearings held on the Applications and fees for submitting the Application to the Village Board, Planning Board and the ZBA.

In addition, the Village Code provides that any specific or "nongeneral costs or expenses incurred by the Village in reviewing any application" shall be deducted from an escrow account to be established at the time any such application is made." (Doc. #78-3 ("Village Code") § 290-102(A)-(B). The escrow account must be replenished to ensure there is an amount sufficient to pay fees or costs at the time they are incurred. (Id. at § 102(B)). In addition to the initial $5,000 escrow fee paid by T-Mobile to the Planning Board, T-Mobile paid an additional $13,000 specifically for Village-RF-Expert Musso's review of the Application, even though the Village's agreement with Musso authorized a total of $9,000. T-Mobile also paid an additional for $18,374 specifically for the Village-RF-Expert Fishman's additional review of the Application. In total, plaintiff submitted over $55,500 in escrow fees for the Village's chosen consultants.

In light of the conflicting evidence on this claim, summary judgment is not warranted. First, as to application and appearance fees, defendants point to Mayor Presti's declaration as evidence the application and appearance fees totaling $2,175 are a reasonable approximation of the Village's costs and are reviewed periodically. (Doc. #70 ¶¶ 33–34, 242). Plaintiff points to deposition testimony showing the Village does not "formal[ly]" collect any data or perform any studies to determine the reasonableness of such fees. (Doc. #76 at 38 (citing 56.1 Stmt. ¶¶ 90, 240). Given the conflicting evidence, a reasonable jury could find in favor of either party as to the reasonableness of the application fees.

So too with respect to the escrow fees. The parties' evidence points in different directions as to whether the escrow funded charges were a reasonable approximation of the Village's objective costs. Mayor Presti testified the Village imposes no cap on consultant fees and does not review consultant invoices for reasonableness or merit before passing them through to the applicant. (56.1 Stmt. ¶ 241). However, Mayor Presti also submitted a declaration that the Village Board and Treasurer in fact reviewed each invoice before payment. (Doc. #70 at ¶ 37–38). "How to weigh the competing evidence is squarely within the province of the jury." Suarez v. Morton, 170 F.4th 33, 65 (2d Cir. 2026).

Similarly, there is a genuine dispute of fact as to whether the fees paid to the outside RF consultants were reasonable. Defendants argue that the retention of the second RF consultant, Village-RF-Expert Fishman, was necessitated by the nature of plaintiff's application, specifically because T-Mobile improperly submitted a site plan application to the Planning Board when it was required to obtain a site selection approval from the Village Board before doing so. And the record does not resolve, one way or the other, whether Village-RF-Expert Musso's approximately $6,000 overcharge above his authorized contract amount was reasonable and an

objective estimate of the work done.

Accordingly, because genuine disputes of material fact remain as to whether the Village's municipal fees were objectively reasonable, both parties' motions for summary judgment on this claim with respect to fees are denied. See T-Mobile Ne. LLC v. Town of Hempstead, New York, 2020 WL 13560055, at *4 (no summary judgment when genuine dispute of fact as to whether municipal fees were reasonable approximations of defendants' objective costs).

2. Application Criteria

Relying on TCG New York, Inc. v. City of White Plains, 305 F.3d 67, 71 (2d Cir. 2002), plaintiff further contends the application criteria separately violate Section 253(a).[10]

The Court disagrees. The provision the Second Circuit invalidated in TCG New York, Inc. v. City of White Plains gave the local authority the discretion to reject any application based on undefined "public interest factors . . . deemed pertinent by the City." 305 F.3d at 76. Village Code Sections 290-64 and 290-77, by contrast, set forth defined substantive criteria—including that an applicant must satisfactorily show a public necessity for the siting of a new public utility and that the proposed facility be in harmony with and not detrimental to the surrounding district—before a special permit application may proceed. Village Code §§ 290-64 and 290-77. Although these provisions certainly give the Village the discretion as to the siting of a public utility, they do so "based on traditional zoning factors, such as aesthetics and property values . . . and [retain] the flexibility to account for necessity." Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 2013 WL 3357169, at *17 n.46 (S.D.N.Y. July 3, 2013), aff'd, 552 F. App'x

12 Plaintiff also argues the Village's delay in reviewing the Application independently violates Section 253(a). Not so. "253(a) does not apply to Plaintiff's claims based on the . . . ["Village's] delay in processing them." Crown Castle Fiber LLC v. Town of Oyster Bay, 2024 WL 1051171, at *28.

47 (2d Cir. 2014) ("[E]ven if Plaintiff had brought a claim for facial invalidity of the Town's Antenna Law under Section 253(a), such claim would be dismissed."). These provisions, therefore, do not provide the Village the "sort of discretion to prohibit telecommunication services" that Section 253 prohibits, and plaintiffs cannot show otherwise. TCG New York, Inc. v. City of White Plains, 305 F.3d at 81.

In sum, the prohibition of service claim as to the municipal fees may proceed, but not as to the application criteria.

VI. Violation of Section 332(c)(7)(B)(iv) (Count VI) (Environmental Effects Claim)

Defendants move for summary judgment on Count VI because the Village Board did not deny the Application based on the perceived effects of RF emissions as it pertained to the Application. Plaintiff moves for summary judgment on the ground that the Village Board did deny the Application in part on these grounds.

The Court agrees with defendants.

A. Legal Analysis

The TCA provides "[n]o State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the [Federal Communications Commission's] regulations." 47 U.S.C. § 332(c)(7)(B)(iv). This prohibition reaches decisions "at least partly based on" RF-emission concerns, "regardless of whether other legitimate reasons factored into the decision or not." T-Mobile Ne. LLC v. Town of Ramapo, 701 F. Supp. 2d at 460.

B. Analysis

As an initial matter, it is undisputed that the Facility complies with relevant FCC

regulations. The question, then, is whether the Village Board Denial was nonetheless "based on" the environmental effects of those emissions.

The Court finds it was not.

The Village Board Denial did not reference RF emissions or the health effects of RF exposure. Although members of the public raised concerns about RF emissions and health effects during the hearing process, defendants maintain—and T-Mobile identifies no evidence to the contrary—that these comments did not influence defendants' decision. Nor does T-Mobile identify any statement by the Village Board invoking RF emissions as a basis for the denial.

Instead, T-Mobile argues that because the Village Board's property-value finding relied in part on "professional expert studies" purporting to show that cell towers depress property values, some of which the Supplemental Lane Report—T-Mobile's own expert submission—criticized as having "considered the health effects of nearby cell tower[s]" (56.1 Stmt. ¶¶ 199–200)—defendants improperly relied on RF emission considerations in denying the application. But the presence of RF-related content within third-party studies showing a negative effect on property values does not, without more, convert the Village Board's decision as being "based on" RF emissions within the meaning of Section 332(c)(7)(B)(iv).

And T-Mobile points to no contrary authority. Indeed, as T-Mobile concedes, the Village Board's property-value finding rested principally on the opinions of a local real estate agent and objecting residents, not on the RF-related content of the studies T-Mobile's own expert criticized. (See supra Section III.B.4).[11] And the record undercuts any inference that the Village

[11] Plaintiff's reliance on Sprint Spectrum L.P. v. Town of Farmington, is misplaced. 1997 U.S. Dist. LEXIS 15832 (D. Conn. Oct. 6, 1997). There, the Court found that the town's commission improperly based its decision on the effects of radio frequency emissions in violation of the TCA because it considered the effects that the fear of emissions would have on

Board knowingly relied on the RF-emissions content of those studies at all: the Village Board admittedly did not "conduct any studies or have any evidence to determine whether the cell tower would [have any] impact," and did not know anything about the "professional studies," including where they were performed. (56.1 Stmt. ¶ 201).

Accordingly, because the record conclusively shows that defendants did not rely on RF emissions or associated health concerns in reaching their decision, defendants are entitled to summary judgment on Count VI.

VII. Violation of Section 332(c)(7)(B)(ii) (Count II) (Unreasonable Delay of the Applications by the ZBA and the Planning Board)

Plaintiff's claim under Section 332(c)(7)(B)(ii) is based on the Planning Board's and ZBA's failure to process its applications within a "reasonable period of time" as defined by the FCC in its Shot Clock Order.[12]

However, a "local authority's exceeding a reasonable time for action would not, in and of itself, entitle the siting applicant to an injunction granting the application." Crown Castle NG E. Inc. v. Town of Greenburgh, N.Y., 2013 WL 3357169, at *17 (citing Shot Clock Order, 24 F.C.C. Rcd. at 14005 n.99). Rather, the only relief for such a failure would be to require a

property values. Id. at *12–13. Here, by contrast, the Village Board's property-value finding was not framed as, or explicitly grounded in, fear of RF emissions. Rather, it rested principally on the opinions of a local real estate agent and objecting residents, with the professional studies cited only as one of several categories of supporting material.

[12] The FCC interpreted the "reasonable period of time" language to presumptively mean "90 days to process personal wireless service facility siting applications requesting collocations, and . . . 150 days to process all other applications," such that a "failure to act" under 47 U.S.C. Section 332(c)(7)(B)(v) would occur after this period expires. See Petition for Declaratory Ruling ("Shot Clock Order"), 24 F.C.C. Rcd. 13994, 14005 (2009), aff'd sub nom. City of Arlington, Tex. v. FCC, 668 F.3d 229 (5th Cir. 2012), aff'd, 569 U.S. 290 (2013). The FCC recognized that these presumptively reasonable periods could be extended "by mutual consent of the personal wireless service provider and the State or local government." Id. at 14013.

written decision. Id.

Here, the ZBA and Planning Board denied the Application as moot in light of the Village Board Denial. Those denials were memorialized in written resolutions on July 17 and July 26, 2023, respectively. (CR 1139–1142). Therefore, because plaintiff has already received the relief to which it would be entitled under this provision, plaintiff's claim for injunctive relief for violation of Section 332(c)(7)(B)(ii) is dismissed as moot.

VIII. Violation of Section 332(c)(7)(B)(i)(I) (Count V) (Unreasonable Discrimination)

Defendants move for summary judgment on Count V, in which plaintiff alleges defendants approved applications for providers of functionally equivalent services in violation of 47 U.S.C. Section 332(c)(7)(B)(i)(I). Plaintiff's response contains no argument in opposition.

By failing to respond to defendants' arguments as to Count V, plaintiff has abandoned it. See, e.g., Nance v. N.Y. Pub. Int. Rsch. Grp. Fund, Inc., 2025 WL 965883, at *6 (S.D.N.Y. Mar. 31, 2025) (arguments not opposed in response brief are deemed conceded).

Accordingly, defendants are entitled to summary judgment on Count V.

IX. Remedy

T-Mobile seeks an injunction directing the Village to immediately issue all approvals and permits necessary for the installation of the Facility. It is well established that the appropriate remedy for violations of the TCA of this kind is a mandatory injunction directing the immediate issuance of the permits and approvals necessary to construct and operate the proposed facility. See Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d at 497. Accordingly, T-Mobile's request is granted.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's cross-motion for summary judgment is GRANTED IN PART and DENIED IN PART.

To summarize, defendants are entitled to summary judgment on Counts V and VI, and plaintiff is entitled to summary judgment on Counts I, III, and VII.

Count II is dismissed as moot.

The case will proceed to trial on plaintiff's remaining claim, Count IV: whether the fees charged in connection with the Application violated the TCA.

Accordingly, it is HEREBY ORDERED that defendants shall, by no later than October 16, 2026, grant the Application and issue all permits and approvals necessary for the construction and operation of the Facility that is the subject of this Action.

The Court will conduct a case management conference on November 18, 2026, at 11:00 a.m., to be held in person at the White Plains courthouse, Courtroom 620, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will continue to make to settle this case. To be clear, counsel are directed to discuss settlement in good faith prior to that date.

The Clerk is instructed to terminate the motions. (Docs. ##68, 75).

Dated: September 16, 2026
White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge